## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## EVANSVILLE DIVISION

| | | |
|---|---|---|
| CHARLES BRUMITT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:20-cv-00260-TWP-MPB |
| | ) | |
| SAM SMITH in his personal capacity, | ) | |
| CITY OF EVANSVILLE, | ) | |
| | ) | |
| Defendants. | ) | |

### ORDER DENYING MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Sam Smith ("Sergeant Smith") and the City of Evansville ("Evansville") (together, "Defendants") (Filing No. 48). Plaintiff Charles Brumitt ("Brumitt") initiated this action alleging claims under 42 U.S.C. § 1983 ("Section 1983") for excessive force in violation of the Fourth Amendment and under state law for assault, battery, and negligence. For the following reasons, Defendants' Motion for Summary Judgment is **denied**.

## I.      BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Brumitt as the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).

At approximately 3:19 a.m. on September 27, 2019, Sergeant Smith, an officer with the Evansville Police Department, passed by Lyles Sports Bar in Evansville during a routine patrol, when he noticed an unidentified third-party stagger toward a pickup truck in the parking lot (Filing No. 51 at 2). Sergeant Smith made a U-turn toward the parking lot, hoping to dissuade the

staggering individual from driving, but by the time he reached the parking lot, the individual was gone.  Sergeant Smith instead saw Brumitt, who was asleep on a utility box behind the bar.  *Id.* Brumitt was laying on his right side, facing out toward Sergeant Smith and he appeared to be drunk and/or passed out. At that time, Brumitt was not suspected of any crime, but Sergeant Smith approached him to check on his welfare and to determine if he had any outstanding warrants. (Filing No. 49-1 at 6–8.)  The encounter between Sergeant Smith and Brumitt, which lasted only a minute, was captured on Sergeant Smith's body-worn camera.

Sergeant Smith approached Brumitt, shined a flashlight in his face, and asked if he was okay (*Id.* at 5; Filing No. 51 at 2).  Brumitt, still laying on his side, was awaken and groggily asked Sergeant Smith who he was and why he was there.  Sergeant Smith responded that he was a police officer and again asked if Brumitt was alright.  Brumitt said "no," and Sergeant Smith said "No? You're not alright?"  Brumitt responded by telling Sergeant Smith he could be "passed out wherever [he] wants."  Sergeant Smith said, "I could take you to jail if I'd like," to which Brumitt said "take me, motherfucker. Take me." Sergeant Smith said back "Take you to jail?" (*See* Brumitt's manually filed video, Exhibit B; Filing No. 57 and Filing No. 58).  The conversation lulled for a second or two before the situation escalated.

Sergeant Smith saw what appeared to be a debit card sticking out of Brumitt's pants pocket. Expecting that the card would have the information he needed to check for outstanding warrants, Sergeant Smith said "Let's see your ID" and reached for the card.  Brumitt then began to sit up and said "Don't you reach in my butt, damnit. Godamnit don't reach in my butt" (Filing No. 49-1 at 16).  Sergeant Smith said "I'll tell you what." Brumitt responded, "Don't do this shit," and then "in a wild, roundhouse swing," Brumitt's right arm struck Sergeant Smith's face.

The record does not reflect whether Brumitt's hand was open or in a closed fist when he swung his arm, but it is undisputed that Brumitt's hand made contact with Sergeant Smith's left cheek and nose (Filing No. 49-1 at 20). The strike startled Sergeant Smith, who had never before been swung at while on duty (Filing No. 56-1 at 40).

After swinging his arm and striking Sergeant Smith, Brumitt said, "Get the fuck off me, motherfucker." Sergeant Smith immediately grabbed Brumitt's shirt collar with his left hand and, with his right fist, struck Brumitt several times in the face (Filing No. 49-1 at 22). Brumitt was struck four times. (*Id.*; Filing No. 55 at 9).[1] By the time Sergeant Smith finished striking him, Brumitt was unconscious, and he remained unconscious for the next four minutes while Sergeant Smith called for medical assistance and handcuffed Brumitt (Brumitt's manually filed video, Exhibit B; Filing No. 57 and Filing No. 58).

Sergeant Smith did not realize Brumitt was unconscious until after the final strike. While it is difficult to discern on the video, Brumitt contends the body-worn camera footage shows that he was in a visibly defensive posture after the first strike, and unconscious after the second strike (Filing No. 55 at 10).

As a result of Sergeant Smith's use of force, Brumitt suffered a comminuted acute fracture of his right orbital floor, a broken nose, and lacerations requiring surgery (Filing No. 55 at 11). Sergeant Smith did not suffer any bruising or other injury to his nose or face, but his right hand remained swollen for three to four days afterwards (Filing No. 49-1 at 26–27).

On September 27, 2019, the Vanderburgh County Prosecutor's Office filed criminal charges against Brumitt for Battery Resulting in Bodily Injury to a Public Safety Official, a Level

---

[1] Defendants do not specify whether Sergeant Smith struck Brumitt three or four times, and the body-worn video footage does not clearly show whether three or four blows were struck. Taking the facts in the light most favorable to Brumitt, the Court accepts his assertion that he was struck four times.

5 Felony, and Public Intoxication, a Class B Misdemeanor.  Brumitt later pled guilty to Public Intoxication and misdemeanor Battery, Class B and A Misdemeanors, respectively (Filing No. 51 at 4). Brumitt filed this action on November 10, 2020, asserting a Section 1983 claim against Sergeant Smith and state law claims for Assault, Battery, and Negligence against Evansville (Filing No. 1).

## II.    SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion."  *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted).  Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted).  "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

### III.   DISCUSSION

Defendants contend they are entitled to judgment as a matter of law because Brumitt's Section 1983 claim should be dismissed under *Heck v. Humphrey*, Sergeant Smith's use of force was objectively reasonable, and Sergeant Smith is entitled to qualified immunity. Defendants further argue that Brumitt's state law claims fail because Sergeant Smith's use of force was justified under Indiana Code § 35-41-3-3(c) and because Evansville is entitled to immunity under the Indiana Tort Claims Act.

Brumitt argues his claims are not barred, Sergeant Smith acted unreasonably by using force that was grossly disproportionate to the threat posed by Brumitt, and Sergeant Smith violated Brumitt's clearly established rights which precludes an award of qualified immunity. In support of his arguments, Brumitt designates, in part, two expert reports regarding the use of force and Brumitt's level of intoxication. On reply, Defendants argue that Brumitt's expert reports are inadmissible and immaterial, and that Brumitt has failed to create a genuine dispute of material fact regarding the reasonableness of Sergeant Smith's use of force.

The Court will first address the admissibility of the expert reports before addressing the merits of Brumitt's Section 1983 claim and state law claims.

A.     <u>**Admissibility of Expert Reports**</u>

Brumitt designates two expert reports—one by Captain Anthony Gregory ("Captain Gregory") regarding the use of force, and one by C. Dennis Simpson, Ed.D, ("Dr. Simpson") on Brumitt's level of intoxication (Filing No. 56-4; Filing No. 56-5).  Defendants point out that Captain Gregory's report is unverified, and therefore inadmissible under Rule56(c).  They do not challenge the admissibility of Dr. Simpson's report, but because that report is also unverified, the Court will discuss the admissibility of both reports.

"Admissibility is a threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009); Fed. R. Civ. P. 56(c). Defendants are correct that Brumitt has not submitted an authenticating affidavit or declaration for his designated expert reports as required by Federal Rule of Evidence 901. Unauthenticated evidence is inadmissible and may not be considered in evaluating a motion for summary judgment.  *See Scott v. Edinburg*, 346 F.3d 752, 759 (7th Cir. 2003) (concluding report introduced without authenticating affidavit was inadmissible and could not be considered on summary judgment); *see, e.g.*, *Schmutte v. Resort Condos. Int'l, L.L.C.*, No. 05-CV-311, 2006 WL 3462656, at *5 (S.D. Ind. Nov. 29, 2006) (citing *United States v. Kelly*, 14 F.3d 1169, 1175 (7th Cir. 1994)); *Bennett v. Gates*, No. 09-cv-00647, 2010 WL 4668367, at *3–4 (S.D. Ind. Nov. 9, 2010) (disregarding unauthenticated evidence on summary judgment).

Both of Brumitt's expert reports are therefore inadmissible for purposes of the summary judgment ruling.  *Neal v. Indianapolis Fire Dep't*, No. 20-cv-02921, 2022 WL 2106143, at *1 (S.D. Ind. June 10, 2022) (declining to consider expert report submitted without authenticating affidavit); *Scott*, 346 F.3d at 759 ("[The expert] report was introduced into the record without any supporting affidavit verifying its authenticity and is therefore inadmissible and cannot be considered for purposes of summary judgment."); *see Est. of Williams v. Ind. State Police*, 26 F.

Supp. 3d 824, 838 (S.D. Ind. 2014) (disregarding unauthenticated expert report and rejecting belated attempt to cure authenticity defect on surreply) (citing *Scott*, 346 F.3d at 759). Accordingly, the Court is unable to—and will not—consider either report in ruling on the summary judgment motion.

### B.    Section 1983 Claim

Defendants argue Brumitt's Section 1983 claim should be dismissed because it is barred by *Heck v. Humphrey*, because Sergeant Smith's use of force was reasonable, and because Sergeant Smith is entitled to qualified immunity.  The Court will address each argument in turn.

### 1.    *Heck* Bar

*Heck v. Humphrey* bars a plaintiff from maintaining a Section 1983 action where a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction.  *Heck v. Humphrey*, 512 U.S. 477 (1994); *see also VanGilder v. Baker,* 435 F.3d 689, 691 (7th Cir. 2006). "The rule in *Heck* is intended to prevent collateral attack on a criminal conviction through the vehicle of a civil suit."  *McCann v. Neilsen,* 466 F.3d 619, 621 (7th Cir. 2006).  In applying *Heck,* the court must look at the relationship between the plaintiff's Section 1983 claim and the charges upon which he was convicted.  *VanGilder*, 435 F.3d at 691.  The court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his actual conviction or sentence, not merely pose a challenge to a potential conviction or charges brought against the plaintiff.  *Id.* at 691–692.  There must be a "clear nexus" between the plaintiff's conviction and the alleged wrongful government act before the *Heck* bar applies to a plaintiff's Section 1983 claim. *Id.* at 692.  "Only a claim that 'necessarily' implies the invalidity of a conviction . . . comes within the scope of *Heck*."  *Gilbert v. Cook*, 512 F.3d 899, 902 (7th Cir. 2008) (citing *Nelson v. Campbell*, 541 U.S. 637, 647 (2004)).

There are three ways by which a claim may be barred by *Heck:* (1) the lawsuit necessarily implies the invalidity of the plaintiff's conviction, (2) facts alleged in the complaint are inconsistent with the plaintiff's conviction, or (3) the complaint implies legal justification for the criminal act upon which the plaintiff was convicted.   Defendants argue Brumitt's Section 1983 claim necessarily implies the invalidity of his conviction for misdemeanor battery (Filing No. 51 at 11).

A Section 1983 claim for excessive force where the plaintiff has been convicted of resisting law enforcement does not automatically lead to the conclusion that the plaintiff's claim is *Heck* barred.  A plaintiff may allege that the force used upon him was excessive in relation to his level of resistance without necessarily challenging his conviction for resisting law enforcement. In *VanGilder v. Baker*, 435 F.3d 689 (7th Cir. 2006), for example, the plaintiff, VanGilder, was taken to a hospital by law enforcement to have his blood alcohol tested.  At the hospital, VanGilder resisted attempts to draw his blood, so the officer struck VanGilder several times in the face to gain compliance.  VanGilder then kicked the officer in the side of the head, and in response, the officer punched VanGilder "repeatedly in the face with a closed fist."  *Id.* at 691.  VanGilder pled guilty to resisting law enforcement, and he later brought a Section 1983 suit against the officer. The district court held that VanGilder's claim was barred by *Heck*, but the Seventh Circuit reversed, finding that VanGilder's claim did not collaterally attack his conviction, deny that he resisted the officer, or challenge the factual basis presented at his plea hearing.  *Id.* at 692.  Rather, VanGilder alleged that he suffered injuries because the officer's response to his resistance was not objectively reasonable.

The Seventh Circuit explained:

[w]ere we to uphold the application of *Heck* in this case, it would imply that once a person resists law enforcement, he has invited the police to inflict any reaction or retribution they choose, while forfeiting the right to sue for damages. Put another way, police subduing a suspect could use as much force as they wanted—and be

shielded from accountability under civil law—as long as the prosecutor could get the plaintiff convicted on a charge of resisting. This would open the door to undesirable behavior and gut a large share of the protections provided by § 1983.

*Id.* at 692.

Defendants contend that *VanGilder* is inapplicable because this case, unlike *VanGilder*, implicates Sergeant Smith's right to self-defense under Indiana Code § 35-41-3-2(c) ([Filing No. 51 at 11](#)–12; [Filing No. 66 at 10](#)).  Defendants argue that Brumitt's claim necessarily implies that Sergeant Smith had no right to use force in self-defense, which in turn implies that Sergeant Smith was not the victim of a battery and, thus, no battery took place ([Filing No. 51 at 12](#); [Filing No. 66 at 11](#)).

Defendants' novel argument is unpersuasive for three reasons.  First, as Brumitt explains in his Response, his Section 1983 claim does not imply that Sergeant Smith "was legally barred from using ***any*** force" ([Filing No. 55 at 26](#) (emphasis in original)).  It implies only that Sergeant Smith was barred from using unreasonable force, and neither Sergeant Smith's right to self-defense nor his official duty to subdue Brumitt allowed him to use unreasonable force.  Ind. Code § 35-41-3-2(c) (describing when "[a] person is justified in using *reasonable* force against any other person" (emphasis added)); *see Hood v. State*, 877 N.E.2d 492, 497 (Ind. Ct. App. 2007), *transfer denied* 891 N.E.2d 40 (Ind. 2008) ("The trier of fact is not precluded from finding that a defendant used unreasonable force simply because the victim was the initial aggressor.").  A reasonable jury could conclude that Sergeant Smith had a right to use reasonable force to defend himself while also concluding that Sergeant Smith in fact used unreasonable force.  *See Flerlage v. Village of Oswego*, No. 13-cv-6024, 2017 WL 5903819, at *5 (N.D. Ill. Nov. 30, 2017) ("Nothing bars presenting an argument along the lines of: 'The police violated my rights by punching me repeatedly after I stopped resisting, regardless of whether I swung my fist first.'"); *see also Gilbert*, 512 F.3d at 901 (7th Cir. 2008) ("One major function of the due process clause is to ensure that a wrongdoer's

punishment comes after a hearing, rather than being meted out on the spot by a public official's fists or weapons.").

Second, the Court may not evaluate an officer's underlying intent or motivation for using force to determine whether the force used was reasonable, so any distinction between Sergeant Smith's motivation in this case and the officer's motivation in *VanGilder* is immaterial. *See Graham v. Connor*, 490 U.S. 386, 397 (1989) ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."). Regardless of an officer's justification for using force, the use of unreasonable force violates the Fourth Amendment. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 395 (1971) ("[S]tate law may not authorize federal agents to violate the Fourth Amendment . . . .").

Third, under the plain language of Indiana Code § 35-41-3-2(c), the victim of a battery is not always entitled to use force in self-defense, so any implication that Sergeant Smith was not entitled to use force in self-defense would not necessarily imply that he was not a victim of battery. Indiana Code § 35-41-3-2(c) provides that a person may only use force to prevent injury from what he "reasonably believes to be the *imminent* use of unlawful force." Ind. Code § 35-41-3-2 (emphasis added). The statute does not, for example, allow a battery victim to strike a perpetrator in retaliation if the victim does not reasonably believe that the perpetrator will imminently use further force. *See cf. Henson v. State*, 786 N.E.2d 274, 278 (Ind. 2003) ("When a defendant arms himself or herself with a weapon before an imminent threat exists in a premeditated strategy to retaliate for past violence (rather than to protect against the imminent use of unlawful force), a self-defense instruction is not available."). Therefore, for purposes of applying *Heck*, even if Brumitt's claim implied that Sergeant Smith had no right to self-defense because—which Brumitt

does not argue and the Court does not hold[2]—his claim would not necessarily imply that Sergeant

Smith was not a victim, so Brumitt's conviction for battery would remain unaffected. *Contra*

(Filing No. 51 at 12).

For all three of these reasons, Brumitt's Section 1983 claim does not imply the invalidity

of his conviction for misdemeanor battery, so it is not barred by *Heck*.

### 2.   **Reasonableness of Use of Force**

Defendants next contend that even if Brumitt's Section 1983 claim is not barred by *Heck*,

they are entitled to summary judgment because the force used by Sergeant Smith was reasonable.

Brumitt asserts six arguments as to why Sergeant Smith's use of force was unreasonable, which

the Court distills down to two overarching arguments: (1) Sergeant Smith used force that was

grossly disproportionate to the threat posed by Brumitt; and (2) Sergeant Smith continued to use

force after Brumitt was unconscious (Filing No. 55 at 15–19).  On reply, Defendants contend that

Brumitt's arguments are based on immaterial evidence, including evidence of Sergeant Smith's

martial arts training[3] and Brumitt's injuries, and call for an improper evaluation of Sergeant Smith's

actions with "the 20/20 vision of hindsight" (Filing No. 66).  The Court finds that a reasonable jury

could conclude that Sergeant Smith used unreasonable force against Brumitt for either or both of

the reasons asserted by Brumitt.

### a.   **Disproportionate Use of Force**

Brumitt argues that Sergeant Smith's reaction to being struck was grossly disproportionate

to the threat he posed, as shown by Brumitt's heavy intoxication, the minimal injury he caused

---

[2] The Court has no occasion to decide whether Sergeant Smith reasonably believed Brumitt would imminently use further unlawful force after striking Sergeant Smith once, as Defendants have not asserted a defense under Indiana Code § 35-41-3-2.  Defendants cite § 35-41-3-2 only in arguing that the statute bars Brumitt's claim under *Heck*.

[3] During his deposition, Sergeant Smith discussed that he is a trained competitive fighter who holds a black belt in judo, a black belt in Japanese JiuJitsu, a blue belt in Brazilian Jiu-Jitsu, and a black belt in Russian Sambo. (Filing No. 56-1.)

Sergeant Smith, Sergeant Smith's martial arts training, and the "devastating" injuries Brumitt suffered.  Defendants respond that Sergeant Smith is entitled to "considerable leeway" in determining the appropriate level of force to use in tense and rapidly evolving situations. Defendants contend that Brumitt was unpredictable, uncooperative, and dangerous, and that Sergeant Smith used reasonable force in responding to Brumitt's "wild" swing.  Defendants also contend that neither Sergeant Smith's martial arts training nor Brumitt's injuries are material in determining the reasonableness of Sergeant Smith's use of force.

Excessive force cases are analyzed under the Fourth Amendment's "objective reasonableness" standard, which "requires careful attention to the facts and circumstances of each particular case," including (a) the severity of the crime at issue, (b) whether the suspect posed an immediate threat to the safety of the officers or others, and (c) whether the suspect was actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 388, 396.  While giving some deference to an officer's perceptions and judgments, the Court's reasonableness inquiry "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396–97; *see Padula v. Leimbach*, 656 F.3d 595, 602 (7th Cir. 2011) ("[T]he dispositive question is whether, in light of the facts and circumstances that confronted the officer . . . [did] the officer behave[ ] in an objectively reasonable manner.").

When Sergeant Smith first came upon Brumitt, he was asleep and apparently heavily intoxicated.  But despite his intoxication, Sergeant Smith had no reason to believe Brumitt had

committed a crime or was armed[4] ([Filing No. 49-1 at 6](#) ("No, I wouldn't have arrested him for public [intoxication] . . . . ").  When Sergeant Smith began asking him questions, Brumitt was disrespectful and used profanities, but he did not sit up, yell, make threats, or otherwise indicate he was prone to violence.  Brumitt only insisted he could be "passed out" where he liked and after Sergeant Smith stated he could "take him to jail," Brumitt boldly invited Sergeant Smith to do so.

Brumitt's non-compliance began when Sergeant Smith said "Let's see your ID," and began reaching toward Brumitt's pocket.  Brumitt initially resisted Sergeant Smith's efforts by sitting up and telling Sergeant Smith not to "reach in [his] butt, dammit."  Brumitt then told Sergeant Smith not to "do this shit" before swinging at him and striking him in the face.  When Brumitt struck Sergeant Smith, he committed at least two offenses—public intoxication, which is a Class B Misdemeanor, and battery, which ranges from a Class B misdemeanor to a Level 5 Felony under Indiana law.  Ind. Code § 7.1-5-1-3; Ind. Code §§ 35-42-2-1(e), (g)(5).

In light of these facts and circumstances, the Court must determine whether Sergeant Smith's particular response was reasonable.  Sergeant Smith, a competitive fighter and trained martial artist, struck Brumitt four times in the face with a closed fist, causing Brumitt to become unconscious.[5] ([Filing No. 49-1 at 23](#)–24 ("I like to think that I could have the power of a one punch knockout and that could take care of it, but I saw a threat and that's what I reacted to. So I'm not

---

[4] Although Sergeant Smith testified he was concerned Brumitt might have had a weapon, that concern was not reasonable ([Filing No. 49-1 at 29](#)). Brumitt was not suspected of any crime when their encounter began. The body-worn camera footage also shows that Brumitt was not wearing any outwear that could have concealed a weapon. Neither Brumitt's intoxication nor the fact that he used force against Sergeant Smith, without more, was enough to create a reasonable belief that Brumitt was armed. *See Strand v. Minchuk*, 910 F.3d 909, 915 (7th Cir. 2018) (stating officer had "no reason to believe an offender was armed" after offender "punch[ed] [officer] at least three times in the face and placing his hands on [officer's] throat").

[5] Defendants argue the Court should also consider that after Sergeant Smith realized Brumitt was unconscious, he did not use "additional force" and "immediately called for an ambulance" ([Filing No. 66 at 4](#)). However, Sergeant Smith's actions following his use of force are not relevant in determining whether the use of force itself was reasonable.

thinking one will take care of it.  And like I said, I -- I train in three to four punches . . . . every time I spar.").  The strikes caused two fractures in Brumitt's face and inflicted lacerations requiring surgery.  Sergeant Smith also suffered bruising to his knuckles that lasted several days.

Defendants argue evidence of Brumitt's injuries and Sergeant Smith's martial arts training are immaterial in evaluating whether Sergeant Smith's use of force was reasonable, but the Court agrees with Brumitt that this evidence is material in measuring the level of force used by Sergeant Smith.  Closed-fist strikes, unlike taser or firearm deployments, can vary widely in severity.  The extent of Brumitt's injuries is therefore "relevant, but not dispositive," in determining how much force Sergeant Smith used in administering four closed-first strikes, and whether the strikes were excessive.  *Nail v. Gutierrez*, No. 06-CV-292, 2008 WL 4545332, at *6 (N.D. Ind. Oct. 10, 2008) (citing *Chelios v. Heavener*, 520 F.3d 678, 690 (7th Cir. 2008) (stating that injury is a relevant factor in making excessive force determination, but "an excessive force claim does not require any particular degree of injury")).  For the same reason, evidence relating to Sergeant Smith's martial arts training and fighting history is material.  Four strikes from a one-hundred-twenty-pound officer with no fighting experience or related training would presumably inflict less force that four strikes from Sergeant Smith, a "heavyweight" fighter who trains regularly, fights competitively, and holds black belts in three fighting styles (Judo, Japanese Jiu-Jitsu, and Russian Sambo) and a blue belt in a fourth (Brazilian Jiu-Jitsu) (Filing No. 56-1 at 3–5, 9–10, 13–14, 17).

In arguing that Sergeant Smith's use of force was reasonable, Defendants cite two cases from the Northern District of Indiana involving the use of similar types of force against intoxicated plaintiffs—*Billingsley v. City of Fort Wayne*, No. 17-cv-00066, 2018 WL 6697075 (N.D. Ind. Dec. 20, 2018) ("*Billingsley*"), and *Nail v. Gutierrez*, No. 06-CV-292, 2008 WL 4545332 (N.D. Ind.

Oct. 10, 2008) ("*Nail*").  Brumitt argues that *Billingsley* and *Nail* are inapplicable because the facts and circumstances of those cases are distinguishable.

In *Billingsley v. City of Fort Wayne*, officers received a call that the plaintiff, Billingsley, had threatened an individual with a knife.  2018 WL 6697075, at *1.  When officers arrived, they saw Billingsley and the individual preparing to fight.  One officer searched Billingsley and recovered a multi-tool with a knife, drugs, and two bottles of alcohol.  The officer also concluded Billingsley was intoxicated based in part on his "loud and slurred speech; unsteady movements; and a generally hostile demeanor."  *Id.* at *2.  Billingsley was arrested but refused to take a breathalyzer test, so the officers transported him to a hospital for a blood sample.  "During the transport, Billingsley continued to act in a belligerent manner and made multiple threats. Billingsley was yelling and cursing in the squad car, and at one point, he told [one of the officers] that he would hide in a bush and shoot [him] the next time he saw [him]."  *Id.*

At the hospital, an officer handcuffed Billingsley's right wrist to the hospital bed rail. "Billingsley continued to yell and curse from the hospital bed, even after being instructed to stop." *Id.*  Officers then left the room but later observed Billingsley in the hospital room searching through his clothing.  The arresting officer had been unable to complete a search of Billingsley before taking him into custody, so the officer was concerned Billingsley might still have access to a weapon.  "Given Billingsley's increasing agitation and the possibility of his having a weapon on his person," the officer again entered Billingsley's room to secure Billingsley's other wrist to the bed.  When the officer did so, "Billingsley became angrier and repeatedly threatened to kill [the officer]."  *Id.* at *3.  The officer "attempt[ed] to diffuse the situation" by speaking with Billingsley, but Billingsley did not calm down.  Instead, he "suddenly twisted his lower body and kicked with his right foot at [the officer's] abdomen, threatening to 'kick [his] ass.'"  Within a tenth of a second

after the kick, [the officer] delivered two controlled strikes to the side of Billingsley's head to achieve mental stunning so that Billingsley would become compliant and no longer pose a risk of harm to himself or others." *Id.*

The Northern District of Indiana concluded that the officer's two strikes to the side of Billingsley's head were reasonable under the circumstances. Billingsley insisted that no reasonable officer "would have felt threatened by the 'slow-motion lethargic attempt at a kick' that he delivered," but the court disagreed. The court stated the officer's "use of escalating force was warranted because Billingsley continued to actively resist [the officer] at the time, and despite the handcuffing, he was clearly not subdued and still posed a threat of harm to the Officers and the hospital staff." *Id.* at *7. The court also noted that the officer did not immediately use an enhanced level of force against Billingsley. "[P]rior to delivering the two strikes to Billingsley's head, [the officer] . . . was present in the room with Billingsley, interacted verbally with him, and used soft hand techniques, including light pressure to Billingsley's face and handcuffing his wrists. Nevertheless, Billingsley continued to resist [the officer], defy his verbal commands, verbally threaten him, and then physically kick at him." *Id.*

Defendants argue that the facts of *Billingsley* are "more plaintiff-friendly than the case at hand," because the officer there struck a "defenseless and restrained plaintiff" (Filing No. 66 at 8 (emphasis omitted)). But Defendants' discussing of *Billingsley* focuses solely on the fact that Billingsley was handcuffed and ignores the remaining facts and circumstances warranting the *Billingsley* officer's use of two head strikes. Despite being handcuffed when the officer struck him, Billingsley continued to actively resist, threaten, and attempt to strike officer. The use of force in *Billingsley* is also distinguishable from this case. Whereas the officer in *Billingsley* administered two strikes to the side of Billingsley's head "to achieve mental stunning so that

Billingsley would become compliant," Sergeant Smith administered four strikes to Brumitt's face to knock him unconscious, pursuant to his training as a competitive fighter (Filing No. 49-1 at 29).

The facts of *Nail* are similar to the facts of *Billingsley* and likewise distinguishable from this case. In *Nail*, two officers arrived at plaintiff Nail's house to investigate a 911 hang-up from the house. 2008 WL 4545332, at *1. When officers arrived, Nail stated his wife had mistakenly misdialed 911, but the officers wanted his wife to confirm the story. Nail then went outside. "Concerned about [the wife's] safety, or that Nail had fled," one of the officers walked outside and around the house and found Nail in his backyard. The officer questioned Nail, "but Nail refused to answer and repeatedly asked why Gutierrez was there. *Id.* at *1. At some point, Nail got up and said he was going back into the house to get a cigarette. [The officer] told Nail that he was not going anywhere and pushed him back into his chair." By Nail's own admission, he was "raising his voice and protesting [the officer's] instructions." Nail also confirmed that he had been drinking and later admitted that he had struck his wife. *Id.* at *2. Nail attempted to leave his chair several more times and each time was pushed back down by the officer. "Fed up with [the] shoving, Nail suddenly got up and tried to push [the officer] back." *Id.* However, Nail missed the officer he intended to push and lunged toward the other. "A scuffle ensued between Nail and the officer," during which Nail resisted the attempts to subdue him." One of the officers "applied a stun strike" to Nail's face because Nail was resisting, but '[w]hen Nail continued to resist the officers, they administered two bursts of pepper spray to Nail's face. That did not work, so they applied three strikes to Nail's thigh in order to handcuff him." *Id.* The Northern District of Indiana determined the officers' uses of force were reasonable considering that Nail "was drunk, confrontational, and raised his voice at the officers. The officers were also on notice that Nail had a proclivity for

violence, given that he had hit his wife earlier that evening.  And Nail readily admit[ted] that he lunged toward [one officer] and tried to shove [the other]."

In this case, the threat posed by Brumitt was less severe, and the use of force by Sergeant Smith was greater, than in *Billingsley* or *Nail*.  When Sergeant Smith first found Brumitt sleeping, he was not suspected of any crime, and Sergeant Smith had no reason to believe Brumitt was armed or had a proclivity toward violence.  During his brief conversation with Sergeant Smith, Brumitt used profanity, but he did not yell at or threaten him, attempt to flee, or refuse any commands.[6] Once Sergeant Smith reached for Brumitt's debit card, Brumitt resisted by slowly sitting up, saying "don't reach in my butt . . . don't do this," and then wildly swinging his arm at Sergeant Smith. Brumitt's conduct, though belligerent and violent, is distinguishable from Billingsley and Nail, who displayed violence resulting in dispatch calls, were alert and agitated when officers arrived, yelled at and threated officers, and continuously and strenuously resisted officers as officers tried to restrain them. Further, in *Billingsley* and *Nail*, the officers used escalating levels of force that they believed were progressively necessary to gain control over the suspect. Sergeant Smith, in contrast, did not attempt to arrest Brumitt or use any lesser level of force that might have detained Brumitt.  Instead, he immediately used enough force to ensure that Brumitt would be rendered unconscious (Filing No. 49-1 at 20–30). *Billingsley* and *Nail* do not show that Sergeant Smith's use of force was proportionate or reasonable.

Considering the facts and circumstances of this particular case, in the light most favorable to Brumitt, the Court cannot conclude as a matter of law that Sergeant Smith's use of force was reasonable.  Brumitt undoubtedly posed a threat to Sergeant Smith when he swung at him, but

---

[6] The only command Sergeant Smith gave Brumitt was "let's see your ID," but the body-worn camera footage shows that Sergeant Smith did not give Brumitt time to comply with the command before reaching into Brumitt's pocket.

there was no reason to believe Brumitt was armed, and the threat he posed was further mitigated by Brumitt's apparent intoxication, drowsiness, and lack of coordination.  While some level of force would have been necessary to subdue and arrest Brumitt, Sergeant Smith's use of four immediate and powerful strikes to Brumitt's face, which caused unconsciousness, was disproportionate.  *See Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) ("When [the officer] first arrived at the scene, he was the only officer on site, and his concern that [plaintiff] might retrieve a weapon or pose a threat to persons inside the house was clearly reasonable. On the other hand, once [plaintiff] was on the ground, unarmed, and apparently unable to stand up on his own, the risk calculus changed. Or so a jury might reasonably conclude. Summary judgment was therefore inappropriate."); *see Ramos v. Drews*, No. 14-CV-2556, 2018 WL 5046087 ,at *13 (N.D. Ill. Oct. 16, 2018) ("[A] jury could reasonably find that . . . [two plaintiffs] shoved the officers and [a third plaintiff] took a step toward them, . . . but [the officers] overreacted and used excessive force when arresting plaintiffs and after they were secured in handcuffs.").

The Court recognizes that officers are often forced to make split-second decisions in tense, uncertain, and rapidly evolving situations, and are therefore given "considerable leeway" in their assessment of the appropriate use of force.  *Abbott v. Sangamon County, Ill.*, 705 F.3d 706 (7th Cir. 2013).  However, even accounting for these factors, the Court concludes that a reasonable jury could find that Sergeant Smith acted unreasonably. Sergeant Smith testified that when he was struck by Brumitt, he "instinctually" acted to "stop the threat" according to his training as a fighter (Filing No. 56-1 at 53 ("**Q**: Was there any training that said the appropriate way to punch a suspect, if you're needing to do that, is to do three or four punches instinctually, sort of in succession, or is that something that you know because of your years in competitive fighting? **A**: I would probably say that comes from my knowledge of competitive fighting.").  But the applicable legal standard

"contemplates a reasonable *officer*, not a reasonable person," and this Court cannot conclude as a matter of law that a reasonable officer who has been struck by a drowsy, intoxicated, and unarmed individual would strike that individual in the face until he was unconscious. *United States v. Brown*, 871 F.3d 532, 537 (7th Cir. 2017) (emphasis in original); *see Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) ("Force is reasonable only when exercised in proportion to the threat posed, and as the threat changes, so too should the degree of force. Force also becomes increasingly severe the more often it is used; striking a suspect once is not the same as striking him ten times." (citations omitted)); *Flerlage*, 2017 WL 5903819, at *6 ("At this stage of the proceedings, the record indicates that some of the force that Tyler alleges, even if it occurred in response to Tyler swinging at [Officer] Melhouse, could be unreasonable. Under Tyler's version of the facts, he offered no physical resistance to the officers besides running at and swinging at Melhouse. And the bare fact of resistance does not preclude a finding that an officer used excessive force; the normal factors for evaluating the use of force still apply. Construing the facts in Tyler's favor, . . . two officers confronted one teenager who had swung at one of them, but then ceased resisting. Under those circumstances, the force alleged—tackling and punching—exceeded what would have been objectively reasonable to subdue Tyler.").

The Court cannot conclude as a matter of law that Sergeant Smith's use of four closed fist strikes to Brumitt's face, causing him to become unconscious, was a reasonable use of force. Because there is a factual dispute on this issue, it should be resolved by the trier of fact and summary judgment on Brumitt's excessive force claim is denied.

### b.     Use of Force After Brumitt Was Unconscious

Brumitt also argues that Sergeant Smith acted unreasonably because he continued striking him even after he was unconscious (Filing No. 55 at 15). Brumitt relies heavily on a slowed, brightened version of Sergeant Smith's body-worn camera footage to show that Brumitt was non-

resistant after being struck the first time. On reply, Defendants argue that the Court should not consider the modified footage because it violates the long-standing principle that an officer's actions must not be judged "with the 20/20 vision of hindsight" (Filing No. 66 at 1 (quoting *Graham*, 490 U.S. at 396)).

The Court agrees with Defendants regarding the modified footage and will therefore not consider it on summary judgment. However, the original body-worn camera footage creates a genuine dispute of material fact regarding the reasonableness of Sergeant Smith's use of force. Defendants do not address whether, based on the original body-worn camera footage, a reasonable officer in Sergeant Smith's position would have realized that Brumitt was unconscious before continuing to strike him. *Flerlage*, 2017 WL 5903819, at *6 ("Decowski's strongest allegation is that Melhouse punched him repeatedly *after* knocking him unconscious. Knowingly using any force against an unconscious person, as asserted here, is objectively unreasonable."). Although Defendants designate testimony from Sergeant Smith stating he did not "process" that Brumitt was unconscious until after administering the fourth and final strike, the Court must evaluate Sergeant Smith's use of force from the perspective of a reasonable officer in Sergeant Smith's position, not Sergeant Smith.

The pertinent question therefore becomes whether a reasonable officer would have perceived that Brumitt was unconscious in between strikes. The Seventh Circuit has held that "an officer will not be held liable if the circumstances under which the force was used evolved so rapidly that a reasonable officer would not have had time to recalibrate the reasonable quantum of force." *Abbott*, 705 F.3d at 733. But this case is not similar to those cited by the Seventh Circuit as evolving so rapidly that an officer cannot "recalibrate" his use of force. *Id.* (citing *Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007) (granting qualified immunity to officer who "fired a

fusillade in an emergency situation" at a large man running toward her with a hammer raised in the air and continued firing until the man was on the ground); and *Hathaway v. Bazany*, 507 F.3d 312, 321–22 (5th Cir. 2007) (finding officer acted reasonably by responding with deadly force when a vehicle he had stopped began accelerating toward him as he approached on foot)). Although Sergeant Smith's encounter with Brumitt escalated quickly, the timeline of events is relatively straightforward: Brumitt and Sergeant Smith spoke for approximately one minute, Sergeant Smith reached for Brumitt's pocket, Brumitt sat up swinging an arm and struck Sergeant Smith, and Sergeant Smith struck him back.

Although Sergeant Smith struck Brumitt in quick succession, enough time elapsed between the second, third, and fourth strikes to see Brumitt with his arms at his sides and his head tilted to the side. An officer in Sergeant Smith's position—an arms-length away from Brumitt—would have been well-positioned to see whether Brumitt had become unconscious, and therefore unable to resist, in between strikes. *See Meyers v. Baltimore County*, 713 F.3d 723, 733 (4th Cir. 2013) ("[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."). A genuine dispute as to whether a reasonable officer in Sergeant Smith's position would have noticed Brumitt was unconscious and had time to recalibrate his use of force precludes summary judgment. *See Strand v. Minchuk*, 910 F.3d 909, 916 (7th Cir. 2018) (affirming district court's denial of officer's motion for summary judgment because "additional fact finding was necessary to determine whether 'the rapidly-evolving nature of the altercation' justified [the officer's] use of deadly force or whether 'he had time to recalibrate the degree of force necessary'" in light of plaintiff's statement of surrender); *Smith v. Finkley*, 10 F.4th 725, 738 (7th Cir. 2021) ("We assess this question [of whether a constitutional violation occurred] from the standpoint of a reasonable officer at the scene under

22

the *Graham* factors. To appreciate that viewpoint, we consider what a reasonable officer in this case's circumstances knew and perceived."); *Lux v. City of Whitewater*, No. 20-cv-1057, 2022 WL 4536935, at *5 (E.D. Wis. Sept. 28, 2022) (denying summary judgment on failure to intervene claim, finding that a jury could review all evidence, including body-worn camera footage and testimony, and conclude that defendant officer had opportunity to intervene but failed to, despite officer's testimony that he did not observe other officers use force beyond *de minimis* contacts).

For this additional reason, summary judgment on Brumitt's Section 1983 claim is **denied**.

### 3.   <u>Qualified Immunity</u>

Defendants argue Sergeant Smith is entitled to qualified immunity on Brumitt's Section 1983 claim.  "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (cleaned up). "[T]wo central questions must be addressed in the course of determining whether qualified immunity is available: whether the plaintiff has alleged a deprivation of a constitutional right at all, and whether the right at issue was clearly established at the time and under the circumstances presented." *Bianchi v. McQueen*, 818 F.3d 309, 319 (7th Cir. 2016) (citation omitted).  Once the defense has been raised, the plaintiff carries the burden of defeating it.  *Smith*, 10 F.4th at 737.

Defendants raise a qualified immunity defense, arguing that Sergeant Smith's use of force did not violate any clearly established right.  In response, Brumitt focuses on Sergeant Smith's alleged use of force against Brumitt after he became unconscious and argues Sergeant Smith violated his clearly established right "to be free from being beaten while unconscious" (<u>Filing No. 55 at 24</u>).  Brumitt argues "[it] has been well established for years that a 'police officer may not continue to use force against a suspect who is subdued'" (<u>Filing No. 55 at 23</u>).  He cites two cases—*Johnson v. Scott*, 576 F.3d 658 (7th Cir. 2009), and *Becker v. Elfreich*, 821 F.3d 920, 920 (7th Cir.

2017)—as examples of cases clearly establishing that officers may not use force against subdued suspects.  Brumitt contends that "[i]f the jury believes Brumitt was unconscious when Sgt. Smith threw punches two, three, and four, then Sgt. Smith violated Brumitt's clearly established constitutional right to be free from being beaten while unconscious.  (Filing No. 55 at 23) (quoting *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009)).

Defendants do not dispute that suspects have a clearly established right not to be subjected to force once subdued, yet they argue that Brumitt has not "come forward with analogous caselaw demonstrating that Sergeant Smith violated a clearly established right" (Filing No. 66 at 9). Defendants appear to misunderstand the scope of the right asserted by Brumitt—the right to be free from force *once subdued*—and they presume that Brumitt was not, from the perspective of a reasonable officer, subdued when Sergeant Smith continued to use force.

In distinguishing *Becker*, for example, Defendants assert that in that case, "the arrestee was not actively resisting or attempting to evade arrest," whereas here, "the undisputed evidence shows that Plaintiff struck Sergeant Smith in the face *prior to* Sergeant Smith using any force" (Filing No. 66 at 10 (emphasis in original)). But for the reasons discussed above, the critical fact of whether Brumitt was unconscious, and thus subdued, after Sergeant Smith's second or third strike remains in dispute.  *Johnson*, 576 F.3d at 660 ("It is well established that a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders. But that principle depends critically on the fact that the suspect was indeed subdued."); *Strand*, 910 F.3d at 917 ("Factual disputes do not resolve on the force of say so, however. What Officer Minchuk sees as undisputed—whether Strand continued to pose a threat at the moment Minchuk deployed deadly force—is actually unresolved and indeed vigorously contested by Strand. . . . [T]he district court rightly determined, after a close and careful analysis of the record, that

Minchuk was not entitled to qualified immunity as a matter of law at summary judgment on the merits of Strand's claim.").

Similarly, in analyzing *Johnson*, Defendants appear to assume that a reasonable officer in Sergeant Smith's position would not have perceived that Brumitt was unconscious because "the Fourth Amendment did not require him to stop and perform a conscious assessment of the situation on a split second's notice, in the heat of the confrontation" (Filing No. 66 at 10). However, the question of whether a reasonable officer would have perceived Brumitt as unconscious and had time to "recalibrate" his use of force remains in dispute, so Sergeant Smith is not entitled to qualified immunity at this stage. *See Strand*, 910 F.3d at 916 (affirming district court's denial of qualified immunity at summary judgment stage in part because of remaining disputes of material fact regarding whether officer had time to recalibrate degree of force necessary); *cf. Johnson*, 576 F.3d at 660–61 (affirming district court's holding that officer used reasonable force against suspect despite apparent surrender once cornered because, in light of suspect's prior attempts to flee and possible possession of a weapon, officer "had no idea how [suspect] was going to behave" and was therefore not subdued).

Further, to the extent Defendants argue that Brumitt must identify a case directly on point to establish his right to be free from force once subdued, they are incorrect. The Supreme Court has repeatedly stated that courts "do not require a case directly on point" if "existing precedent [has] placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011). A long history of cases has clearly established that a suspect has a constitutional right not to be subjected to force once subdued. *See, e.g.*, *Abbott*, 705 F.3d 706 ("[I]t was well-established in 2007 that police officers cannot continue to use force once a suspect is subdued…. [T]here is no question that [the suspect] was in fact subdued by the first tasing—she immediately

fell to the ground and convulsed but made no movement after the first tasing ending…."); *Frazell v. Flanigan*, 102 F.3d 877, 884 (7th Cir. 1996), *overruled on other grounds* (affirming jury verdict in favor of plaintiff and against officer in excessive force case because jury could reasonably conclude that officer who struck subdued suspect in the back with a baton was objectively unreasonable force to which qualified immunity did not apply). Brumitt offered *Johnson* and *Becker* as two examples of the many cases that have reiterated that right.  He is not required to find a factually analogous case directly on point to meet his burden.

Genuine disputes of material fact as to whether Brumitt was unconscious and whether a reasonable officer would have perceived him as unconscious and had time to recalibrate his use of force preclude summary judgment on Sergeant Smith's qualified immunity argument.

### C.      Indiana State Law Claim

In addition to his Section 1983 claim, Brumitt asserts state law claims for assault, battery, and negligence against Evansville. Defendants argue Brumitt's state law claims should be dismissed for two reasons.  First, Sergeant Smith's use of force was justified under Indiana Code § 35-41-3-3(c), which permits an officer to use "reasonable force if the officer reasonably believes that the force is necessary to enforce a criminal law or to effect a lawful arrest." And second, Evansville is immunized from liability under the Indiana Tort Claims Act, which provides that governmental entities and their employees are not liable for any loss resulting from the adoption and enforcement, or failure to adopt or enforce, a law, rule, or regulation, unless the enforcement "constitutes false arrest or false imprisonment."  Ind. Code § 34-13-3-3(a)(8).

Brumitt responds that neither Indiana Code § 35-41-3-3(c) nor the Indiana Tort Claims Act's ("ITCA") immunity provision apply because Sergeant Smith used unreasonable force. Brumitt argues that Indiana Code § 35-41-3-3(c) only permits the use of "reasonable force" that an officer "reasonably believes" is needed to effect an arrest, and the parties agree that "Indiana's

excessive force standard effectively parallels the federal standard." (Filing No. 55 at 27.)  Brumitt similarly argues that under Indiana law, the ITCA does not immunize governmental entities from liability arising from the use of excessive force. (Filing No. 55 at 26); *see Gupta v. Melloh*, 19 F.4th 990, 1002 (7th Cir. 2021) ("The Indiana Supreme Court has held that because the Indiana Code limits police officers to using only the force that is reasonable to effectuate an arrest, an officer's use of excessive or unreasonable force is not shielded from liability or subject to immunity under the Indiana Tort Claims Act." (citing *Wilson v. Isaacs*, 929 N.E.2d 200, 203 (Ind. 2010))).

On reply, Defendants concede both points to Brumitt, stating "that the parties are in agreement that this Court's conclusion as to the reasonableness of Sergeant Smith's [conduct] under the 4th Amendment is determinative as to Plaintiff's state law claims" (Filing No. 66 at 12). Because the Court has already concluded that a reasonable jury could find that Sergeant Smith's use of force was unreasonable, Brumitt's state law claims survive summary judgment.

## IV.   CONCLUSION

As explained above, there are numerous material facts in dispute in this case.  The Court does not determine whether the disputed facts are true, but simply determines whether the disputed facts could lead a jury to find in favor of the non-moving party. For the reasons discussed above, Defendants' Motion for Summary Judgment (Filing No. 48) is **DENIED** and this matter shall be resolved by trial on July 18, 2023 or settlement. The parties are directed to contact the Magistrate Judge to schedule a settlement conference.

**SO ORDERED**.

Date:   1/25/2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Joseph N. Williams
WILLIAMS & PIATT, LLC
joe@williamspiatt.com

Robert L. Burkart
ZIEMER STAYMAN WEITZEL & SHOULDERS
rburkart@zsws.com

Matthew Stephen Koressel
ZIEMER STAYMAN WEITZEL & SHOULDERS LLP
mkoressel@zsws.com

Keith W. Vonderahe
ZIEMER STAYMAN WEITZEL & SHOULDERS
kvonderahe@zsws.com